**UNITED STATES, Appellee,**

v.

**Yanokura FELIZ, Defendant,
Appellant.**

No. 98–2301.

United States Court of Appeals,
First Circuit.

Heard June 7, 1999.

Decided July 7, 1999.

Jeffrey H. Cramer with whom Brown, Rudnick, Freed & Gesmer, P.C., by Appointment of the Court, was on brief for appellant.

Margaret D. McGaughey, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, was on brief for appellee.

Before Torruella, Chief Judge, Campbell, Senior Circuit Judge, and Boudin, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Appellant Yanokura Feliz pleaded guilty in federal district court in Maine to one count of possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), (b)(1)(B). Prior to entering his guilty plea, Feliz filed a motion to suppress evidence seized from his residence on the ground that the warrant authorizing the search was not based on probable cause. The district court ruled that probable cause was lacking, but that the evidence was nevertheless admissible under the "good faith exception" recognized in *United*

*States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We agree that the evidence was admissible and *affirm* Feliz's conviction.

## I. *BACKGROUND*

On December 3, 1997, a Maine grand jury returned a two-count indictment charging Feliz with trafficking in cocaine. A Maine Superior Court judge subsequently issued an arrest warrant for Feliz.

Thereafter, on December 29, 1997, Agent John L. Dumas, a Special Agent of the Maine Drug Enforcement Agency who was investigating Feliz for drug trafficking, submitted an affidavit in support of a search warrant for Feliz's residence, located at 401 Cumberland Avenue, Apartment #1006 in the City of Portland, Maine. The affidavit sought a warrant to search Feliz's residence for evidence of drug trafficking including documents, records, and sums of money.

The following facts were alleged in Agent Dumas's affidavit. On September 22, 1997, Agent Dumas debriefed a cooperating individual ("CI") concerning CI's knowledge of drug trafficking in Southern Maine. CI reported to Agent Dumas that he/she had purchased cocaine from a Domician male known as "John" (CI did not believe this to be the man's real name) since the summer of 1985. CI also reported that he/she initially had to travel to New Hampshire or Massachusetts to buy cocaine from "John," but that during the summer of 1997 "John" moved to Portland and, thereafter, CI continued to purchase cocaine from "John." Agent Dumas showed a picture of Feliz to CI, who confirmed that the man in the photo was the man known to CI as "John."

CI made two controlled purchases of cocaine from Feliz. On September 18, 1997, Feliz sold approximately 8 grams of cocaine to CI in exchange for $400. The purchase took place on Oak Street in Portland. Prior to the meeting, CI and Feliz spoke on the phone and agreed to meet at the Wit's End, a tavern on Congress Street. When Feliz arrived at the Wit's End in a green Toyota Forerunner, he motioned for CI to follow him, then turned left onto Oak Street. CI walked to Oak Street and entered the Forerunner. CI handed Feliz the $400 and Feliz handed CI 8.4 grams of cocaine. CI then got out of the Forerunner and Feliz drove away. CI gave the cocaine to a Special Agent of the Maine DEA, who in turn sent it to the laboratory for analysis. The laboratory analysis confirmed that the substance was cocaine.

On September 24, 1997, CI made a second controlled purchase of cocaine from Feliz. Again, CI and Feliz arranged by telephone to meet, this time at Gold's Gym in South Portland, where Feliz agreed to deliver 7 grams of cocaine in exchange for $400. Agent Dumas drove CI to Gold's Gym and watched as CI met with Feliz and the two exchanged the money for the cocaine. Feliz went into the gym and CI joined Agent Dumas in his car, where CI turned over the cocaine. A subsequent laboratory analysis confirmed that the substance delivered to CI was 7 grams of cocaine.

Shortly after this second controlled purchase, Feliz refused to sell CI any more cocaine. According to CI, Feliz changed his cellular phone number and pager number. CI told Dumas that Feliz had stated he (Feliz) was going to invest the profits from drug sales into a "legitimate" business. According to CI, Feliz said that he was going to open a cigar store. In December, 1997, Agent Dumas confirmed that Feliz had opened "Fortune Cigars" in November, 1997.

On November 16, 1997, a cooperating defendant ("CD") was arrested on cocaine trafficking charges. CD told Agent Dumas that he/she knew a Dominican male from Lawrence who called himself "John" and lived in Portland on Cumberland Avenue in a "really tall apartment building." CD also told Agent Dumas that "John" sold cocaine and had large sums of money.

Paragraph III. F. of Agent Dumas's affidavit further stated: "According to CD# 1, FELIZ talked with CD# 1 sometime in the late summer or early fall of 1997, and discussed the possible sale of 1 kilo of cocaine from CD# 1 to FELIZ."[1]

Agent Dumas subsequently learned that Feliz lived in an apartment at 401 Cumberland Avenue, a sixteen-story apartment building. On December 29, 1997, Agent Dumas spoke with an assistant manager at the apartment complex, who informed him that Feliz lived in apartment # 1006.

In addition to the information provided by CI and CD, Agent Dumas's search warrant affidavit contained a paragraph setting forth in detail his training and experience in the investigation of drug trafficking crimes. Agent Dumas stated that he had been a law enforcement officer for approximately four years, and was sworn as a Special Agent of the Maine DEA in May, 1996. Agent Dumas further stated that

> [f]rom my experience, education, training and/or study, I know it to be quite common for those involved in the illegal trafficking/furnishing of scheduled drugs to possess, maintain and keep with them, near them, and/or in their residences business records and journals relating to the trafficking and/or furnishing of scheduled drugs. . . .

Agent Dumas continued:

> In particular, I know that, where, as here, an individual is demonstrated to be trafficking in drugs, it is not uncommon for there to be evidence of their drug trafficking activities, such as drug records, telephone numbers of suppliers and customers, drug trafficking paraphernalia, drug proceeds and/or evidence of transfer, expenditures or investment of drug proceeds kept at the trafficker's residence.

Finally, with regard to sums of money in the possession of drug traffickers, Agent Dumas stated that in his experience it was

> common for those involved in the illegal trafficking/furnishing of scheduled drugs to possess and keep with them, near them, and/or at their residences, sums of money . . . either as a result of scheduled drug sales or for the purpose of purchasing scheduled drugs or facilitating scheduled drug sales with others. Because such moneys are not usually safely disposed of legitimately (e.g., deposited in a bank or declared as taxable income), it is common for those who traffick or furnish illegal scheduled drugs to keep these sums on their person or near them, in a safe location, frequently in their residences, and/or at/ near their residences, and/or near the same location where they keep their drugs, or maintain drug operations.

On December 29, 1997, a Maine District Court judge issued a warrant authorizing the search of apartment # 1006 at 401 Cumberland Avenue in Portland for documents, records, and sums of money related to drug trafficking. While executing the search warrant and an arrest warrant at Feliz's apartment, Agent Dumas, along with other agents, seized approximately 516 grams of cocaine.[2]

On December 30, Agent Dumas swore out a complaint against Feliz in Maine federal district court. On January 21, 1998, a federal grand jury returned an indictment charging Feliz with possession with the intent to distribute cocaine, 21 U.S.C. § 841(a)(1), (b)(1)(B). Feliz moved to suppress the evidence seized from his apartment on the ground that the warrant was not supported by probable cause.

---

1. Agent Dumas stated in the affidavit that based upon his training and experience, one kilo of cocaine had a street value of approximately $22,000.

2. In executing the search warrant, Agent Dumas did not inform Feliz that the warrant did not authorize a search for drugs or weapons. When Agent Dumas asked Feliz whether there were any drugs or guns in the apartment, Feliz pointed to a shopping bag that contained cocaine. The agents did not seize any records or monies relating to drug trafficking.

Feliz argued in particular that the facts set forth in Agent Dumas's affidavit failed to establish a "nexus" between the drug trafficking information and his apartment. The district court ruled that the warrant was not supported by probable cause, but nevertheless denied Feliz's suppression motion on the ground that the *Leon* "good faith exception" applied. *See Leon,* 468 U.S. at 922, 104 S.Ct. 3405 (holding that evidence seized in reasonable good-faith reliance on a search warrant, which is later found defective, may be admitted at trial). Shortly thereafter, Feliz pleaded guilty, reserving his right to challenge on appeal the denial of the motion to suppress.

## II. *DISCUSSION*

■ A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the "commission" element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called "nexus" element. *See United States v. Zayas–Diaz,* 95 F.3d 105, 111 (1st Cir.1996). With regard to the "nexus" element, the task of a magistrate in determining whether probable cause exists is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In order to establish probable cause, the facts presented to the magistrate need only "warrant a man of reasonable caution" to believe that evidence of a crime will be found. *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion). The probable cause standard "does not demand showing that such a belief be correct or more likely true than false." *Id.*

■ As a reviewing court, we too must examine the affidavit in a practical, commonsense fashion, and we accord "considerable deference" to a magistrate's determination that information in a particular affidavit establishes probable cause. *Zayas–Diaz,* 95 F.3d at 111 (quoting *United States v. Taylor,* 985 F.2d 3, 6 (1st Cir.), *cert. denied,* 508 U.S. 944, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993)). Our inquiry is whether the magistrate had a "substantial basis" for concluding that probable cause existed. *Taylor,* 985 F.2d at 5.

■ The district court concluded that Agent Dumas's affidavit did not set forth facts showing a sufficient nexus between the probable criminal activity described in the search warrant and Feliz's apartment. The government urges us to reverse the district court's probable cause ruling and to uphold the warrant without reliance upon the *Leon* good faith exception. *See Leon,* 468 U.S. at 925, 104 S.Ct. 3405 (courts have discretion to consider the issue of officers' good faith without first addressing Fourth Amendment issue). We agree with the government that in all the circumstances the affidavit contained sufficient evidence of probable cause to permit the magistrate to issue a warrant to search Feliz's residence.

The affidavit included information from two informants who relayed their first-hand observations of drug trafficking involving an individual whom they knew as "John."[3] CI identified a photograph of Feliz shown to him by Agent Dumas as the "John" from whom he had purchase cocaine on several prior occasions, beginning as early as 1985. CI also provided details concerning his conversations with Feliz

---

**3.** Feliz contends that there is no evidence that Feliz was the "John" identified by CD, although Agent Dumas indicates in paragraph III.F. of the affidavit that CD had stated that he and "Feliz" discussed the possible sale of 1 kilo of cocaine. Indeed, Feliz argues that Agent Dumas intentionally or, at least, reck-

lessly changed the name "John" to "Feliz" in an effort to mislead the magistrate. We need not resolve these contentions, as the information supplied by CI itself provided a substantial basis for believing that Feliz was involved in drug trafficking.

prior to each of the two controlled purchases, including the name and address of the places where they agreed to meet. CI provided further details, later confirmed by the investigating agents, concerning the color, make, and registration number of Feliz's car. One of the controlled purchases was observed directly by Agent Dumas. The affidavit further stated that after each sale, the drugs were sent to a laboratory for analysis, which confirmed that a specific amount of cocaine was present. In sum, the affidavit contained substantial, detailed information indicating that Feliz had engaged in illegal drug trafficking for at least twelve years, most recently in the Portland area.

 Feliz argues that because the drug transactions described in the affidavit took place approximately three months prior to issuance of the warrant they were "stale." But courts have upheld determinations of probable cause in trafficking cases involving similar or even longer periods. *See, e.g., United States v. Greany,* 929 F.2d 523, 525 (9th Cir.1991) (two year-old information relating to marijuana operation not stale); *Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991) (noting that in drug trafficking cases, information may be months old). Based upon CI's two controlled purchases of cocaine in September, and CI's statement that he had been purchasing drugs from Feliz for approximately twelve years, the agents could reasonably have believed that Feliz's drug trafficking was of a continuous and ongoing nature.[4]

Feliz's only argument of any strength is that Agent Dumas's affidavit did not establish a sufficient connection between the alleged criminal activity and his 401 Cumberland Avenue apartment. He points out that none of the drug sales occurred at or near his apartment, and contends that

Agent Dumas's experience in drug trafficking cases and his opinions regarding the habits of drug traffickers with regard to retention of drug trafficking records and proceeds are inadequate to supply the required nexus. The district court agreed.

We disagree with the district court's conclusion that probable cause to search Feliz's apartment was lacking. The criterion, as we have noted, is whether the facts presented in the affidavit would "warrant a man of reasonable caution" to believe that evidence of crime will be found. *Brown,* 460 U.S. at 742, 103 S.Ct. 1535. There is no requirement that the belief be shown to be necessarily correct or more likely true than false. *See Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) ("only the probability, and not a prima facie showing" is required). A "practical, commonsense" assessment, providing a substantial basis for the magistrate's finding of probable cause, is what is called for. *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. *See also Taylor,* 985 F.2d at 5.

 In addition to Agent Dumas's experience and opinions, to which the magistrate was entitled to accord some weight, *see Brown,* 460 U.S. at 742–43, 103 S.Ct. 1535, the affidavit presents facts from which a reasonable inference could be drawn as to the probable presence of incriminating evidence at Feliz's apartment. CI, whose information was corroborated by Agent Dumas, identified Feliz as a long-time, successful, drug trafficker. It could reasonably be supposed that a regular trafficker like Feliz possessed documents showing the names and telephone numbers of customers and suppliers as well as accounts showing the monies paid and collected. It was also reasonable to suppose that he kept the money he collected and used in his business in some safe

---

**4.** We agree with the district court's conclusion that the mere fact that Feliz apparently opened a cigar business did not lead to the inevitable conclusion that Feliz had "gone straight," thus rendering reliance on the warrant unreasonable. As the district court explained in its opinion, it was not unreasonable for the agents to suspect that Feliz's drug trafficking continued, perhaps even in conjunction with the cigar business.

yet accessible place. The affidavit indicated that Felix resided in apartment # 1006 at 401 Cumberland Avenue, Portland. No other residence or drug-dealing headquarters of his was identified in the affidavit.[5] It followed that a likely place to seek to find incriminating items would be Feliz's residence. *See, e.g., United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) (stating that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live"). If he did not maintain his accounts and records, and the presumably large sums of money received in the course of his dealings, at his apartment, where else would he keep them?

■ In saying this, we do not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence. All factors must be weighed in each case in order to assess the reasonableness of inferring that evidence of the crime can be found at the suspect's home. We say only that interpreting a search warrant affidavit in the proper "commonsense and realistic fashion," *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), may result in the inference of probable cause to believe that criminal objects are located in a particular place, such as a suspect's residence, to which they have not been tied by direct evidence.

■ The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity

for concealment and normal inferences as to where a criminal would hide [evidence of a crime]...." *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir.1979). In the case of drug peddlers like Feliz, other circuits have upheld searches of the suspect's residence in circumstances somewhat similar to these. *See Angulo–Lopez*, 791 F.2d at 1399 (holding that direct evidence that contraband or evidence indicating drug trafficking is at a suspect's residence is not essential to establish probable cause); *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C.Cir.1993)(per curiam) (observations of drug trafficking occurring away from suspect's residence can provide probable cause for search of house); *United States v. Williams*, 974 F.2d 480, 482 (4th Cir.1992) (per curiam) (affidavit establishing that known drug dealer currently resided in motel room held sufficient to establish probable cause that drug paraphernalia would be found in room); *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir. 1986) (probable cause for search of drug dealer's apartment even though defendant was not seen using apartment).[6] We do not find it unreasonable for the issuing judge in this case to have relied upon her common sense, buttressed by affiant's opinion as a law enforcement officer, that Feliz would be likely to keep proceeds from his drug trafficking and records relating to drug transactions at his apartment.

As in the totality of circumstances here there was a sufficient showing of probable cause, we see no need to pursue the issue of good faith under *Leon*, although we

---

5. There was no indication that Feliz used the cigar store he opened in November, 1997, several months after the September, 1997 controlled purchases, for drug trafficking purposes.

6. Some district courts, like the court below, have held in somewhat analogous circumstances that probable cause did not exist for a search of a suspect's residence. *See United States v. Rosario*, 918 F.Supp. 524, 528 (D.R.I.1996) (opinion of DEA special agent based upon her knowledge of behavior and

practices of narcotics deals could not, by itself, furnish nexus between criminal activity and place to be searched); *United States v. Rios*, 881 F.Supp. 772, 775 (D.Conn.1995) (agent's expert opinion does not, standing alone, establish nexus); *United States v. Gomez*, 652 F.Supp. 461, 463 (E.D.N.Y.1987) (same); *United States v. Kenney*, 595 F.Supp. 1453, 1461 (D.Me.1984) (mere statement in affidavit that suspect had committed drug crime not enough to establish nexus to residence).

have no doubt the district court was well justified in applying the *Leon* criteria in this case had that been necessary.

*Affirmed.*